## THE STATE OF IOWA v. ST. CLAIR.

1. **Criminal law:** CONCEALING STOLEN PROPERTY. Being present where stolen property is concealed, knowing it to be stolen, and keeping silent and refusing to give information to officers searching for the same, is, when unexplained, conduct sufficient to warrant a conviction, notwithstanding the evidence does not show that the accused was in the physical possession of the property secreted.

*Appeal from Des Moines District Court.*

SATURDAY, OCTOBER 15.

THE defendant, indicted for receiving and aiding in concealing stolen goods, knowing the same to be stolen, pleaded

not guilty; was tried, convicted, and after his motions in arrest and for a new trial were overruled, had the sentence of the law duly passed upon him; from which he appeals.

*C. Ben Darwin* for the prisoner.

*C. C. Nourse*, Attorney-General, for the State.

LOWE, J. — The record presents no perceptible error, or questions of law arising upon the pleadings, or in any

1. CRIMINAL LAW: stolen property.

stage of the trial, unless it was the overruling of the motion for a new trial, because the verdict was against the weight of evidence, and this is the question chiefly relied upon in the discussion at bar. The testimony is all in the record. It is not insisted that it furnishes any direct proof of the prisoner's guilt, but that such guilt is inferable from the relation which he sustained to other confessedly guilty parties, and especially the criminative attitude in which facts and circumstances place him, just before and at the time of his detection and arrest. To appreciate the force of the circumstances, which make the basis for the inference of the defendant's guilt or innocence in the transaction, it will be necessary to recast the scene attending the detection and arrest of the several parties accused.

In October, 1862, John Proschaska, a jeweler in the city of Burlington, was robbed of some $3,000 worth of jewelry, consisting of gold and silver watches, lockets, &c. In February following, Ed. J. Atting, a detective officer from Lafayette, Indiana, was in Burlington, and ascertained that one Callendine of that place had a quantity of stolen jewelry in his possession. He proposed to buy some $1,800 worth of jewelry of him, with counterfeit money, at fifty cents on the dollar, of postage currency, and twenty cents on the dollar, with other counterfeit money. The contract was partially entered into, when Atting returned

to Indiana, and in May thereafter, came out again, bringing with him John Godman, sheriff of Tippecanoe county, Indiana. He called upon Callendine, and informed him that he had sent out $4,000 of his money by express, and that it was then in the express office. Whilst at Callendine's home, one Walker and the defendant St. Clair came in, and were introduced to Atting. This was the first time Atting had met St. Clair. That afternoon, St. Clair inquired of Atting whether he and Callendine had yet come to a contract. The answer was, that they had not finally concluded the contract. Next morning, St. Clair was sent by Callendine to Atting, to get him to meet Callendine at his brick-yard. The meeting took place, and the trade was made. At noon, Callendine was to advise Atting when he could see and examine the jewelry. Turner's room was fixed upon as the place, and nine or ten o'clock that night, the time agreed upon for the interview and exchange. St. Clair had been introduced to Atting as a burglar, by Callendine. That afternoon, St. Clair and Atting were much together, during which the former said to the latter, he wanted the trade to come off, as he desired to get some of the stuff (meaning the counterfeit money), to go up the river. St. Clair told Atting, the same afternoon, that Callendine wanted him to come to his house that evening, to assist in putting a valuation on the jewelry. He did go, and returned in about an hour, and said to Atting, that he and Callendine had placed a value on the jewelry, and that Callendine would be up in a few minutes. He came, bringing with him a man named Bryant, who was the deputy sheriff of Tippecanoe county, Indiana. They and myself went over to Turner's room; struck a light. Callendine then got his jewelry, hid behind some wood, about the time St. Clair and Turner came in. The jewelry was spread upon the table; a paper, containing a

list and the value of the jewelry, was produced. Atting objected that the price was entirely too high, and the trade could not be made at the figures specified. St. Clair and Turner were then chosen to make another estimate, which was satisfactory, and Atting then left the room to go after his counterfeit money, leaving Callendine, St. Clair, Turner and Bryant sitting around the table on which the jewelry was spread out. The next scene, which occurred a few minutes thereafter, was the entry into this room by the officers to make arrests. The jewelry had been replaced into a small sack, and hid away. A half hour's search found it concealed under the stone on the floor. Upon examination, it was found to contain some twenty odd gold and silver watches, which were identified as the property which had been stolen from Proschaska and his customers, the October before.

In connection with this, it must be remembered that St. Clair was himself a professed burglar and counterfeiter; he was so introduced to Atting. He told Atting, the afternoon before the arrest, that he and his partner, that night, had arranged to make (in his language) a trick, but would have to waive it, on account of the trade between him and Callendine. He said he was anxious that the trade should be effected, as he wanted to go up the river with the counterfeit money Atting was to let Callendine have. He therefore knew that they were both counterfeiters, or supposed to be such. He was their go-between in making the trade; brought the parties together; assisted in estimating the value of the jewelry; reconciled the parties, when a difference sprung up, by making a new valuation of the jewelry; was present, and took part in making the trade and bringing the parties together. To hold that he was ignorant, all this time, that the jewelry was stolen property, would be to indulge in a very absurd presumption.

What motive could there be in concealing that fact from him? He was himself engaged in that very business. The money that was to be taken in exchange for the watches, he knew was counterfeit money. What reason was there for concealing the character of the title to the goods or jewelry from him? None, whatever; and we think he could not have witnessed all the machinery that was employed in making the trade, the places where it was done, and the other circumstances, too suspicious to be consistent with an honest transaction, without having a guilty knowledge of the character of the property that was attempted to be exchanged. Then, again, as to the concealing of this stolen property. It is not necessary that the evidence should show that he had physical possession of it himself, and concealed it with his own hands. But if he was present, knew that it was stolen property, and saw it hid by another, and kept silent, and refused to give information to the officers searching for the same, such conduct, unexplained, makes him as guilty, in law, as the party whose hands actually secreted the goods. Yet this is the position in which the evidence places him; and the jury, in our opinion, could not do otherwise than they did, return a verdict of guilty. It follows, in our judgment, that the court did not err in overruling the motion for a new trial, and its ruling, in that respect, is

Affirmed.